IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 08-289-3 |
| | : | |
| ROBERT DALES | : | |

Diamond, J.   November 12, 2009

**MEMORANDUM**

On October 21, 2009, a jury convicted Defendant Robert Dales of conspiracy to commit armed bank robbery, armed bank robbery, and carrying a firearm during a crime of violence. 18 U.S.C. §§ 2, 371, 924(c), 2113(d) (2008). At trial, I permitted the Government to introduce the "proffer statements" Dales had earlier made to the FBI. I write here to explain more fully the basis of that ruling.

I.   Background

On July 24, 2008, the grand jury charged Dales, Dante Toliver, Joseph Dunston, and William Matthews with the gunpoint robbery of a Bank of America branch in Glenside, Pennsylvania. (Doc. No. 17.) Dunston and Matthews pled guilty. The five-day trial of Dales and Toliver concluded on October 21, 2009.

The evidence showed that on January 22, 2008, Matthews urged Dales and the others to rob a bank in Glenside. Minutes after Matthews reconnoitered the bank, Dunston, Dales, and Toliver – wearing hooded sweatshirts, ski masks, sunglasses, and gloves – entered the bank. Dales and Dunston brandished handguns, threatening employees while Dunston snapped up

1

money. Toliver was unarmed and made no threats. Rather, he took money from the teller's drawer and then fled with Dales and Dunston. The jury convicted Toliver of conspiracy to commit armed bank robbery, and Dales of the substantive robbery and firearms offenses as well as the conspiracy charge.

II.     The Proffer Statements

The Government commonly offers defendants who seek to cooperate the opportunity to make an "off-the-record proffer." Defendants seeking to "proffer" do so pursuant to the terms of a proffer agreement or letter drafted by the Government. Although the precise wording of these agreements varies from District to District, the import is the same: (1) if the defendant elects to go to trial, the Government will not use the defendant's proffer directly against him or her; (2) the Government may make derivative and investigative use of the proffer; and (3) the Government may use the proffer to rebut any effort by the defendant that contradicts the proffer's substance, regardless of whether the contradiction manifests itself through testimony, other evidence, or the representations of counsel. See United States v. Al-Esawi, 560 F.3d 888, 892 (8th Cir. 2009); United States v. Artis, 261 Fed. Appx. 176, 178 (11th Cir. 2008); United States v. Fifer, 206 Fed. Appx. 502, 504-05 (6th Cir. 2006); United States v. Barrow, 400 F.3d 109, 113-14 (2d Cir. 2005); United States v. Rebbe, 314 F.3d 402, 404 (9th Cir. 2002); United States v. Williams, 298 F.3d 688, 691 n.1 (7th Cir. 2002).

In this District, the Government's standard proffer letter includes these provisions. Accordingly, the proffer agreement signed by Dales and his counsel stated, *inter alia*, as follows:

> First, no statements made by you or your client, or other information

> provided by you or your client during the "off-the-record" proffer, will be used directly against your client in any criminal case.
>
> Second, the government may make derivative use of, and may pursue investigative leads suggested by, statements made or information provided by you or your client. . . . .
>
> Third, if your client is a witness or party at any trial or other legal proceedings and testifies or makes representations through counsel materially different from statements made or information provided during the "off-the-record" proffer, the government may cross-examine your client, introduce rebuttal evidence and make representations based on statements made or information provided during the "off-the-record" proffer. This provision helps to assure that your client does not abuse the opportunity for an "off-the-record" proffer, make materially false statements to a government agency, commit perjury or offer false evidence at trial or other legal proceedings.

(Doc. No. 118 at 4-5.)

Dales and his then-counsel attended proffer sessions with the FBI on August 11 and September 5, 2008. During these sessions, Dales admitted that: (1) on January 22, 2008, he, Matthews, Dunston, and a man Dales knew as Dante drove to the Bank of America branch in Glenside; (2) Matthews entered the bank, returning a few minutes later to tell the others that the bank looked "sweet," and that the vault was open; (3) Dales, Dunston, and "Dante" then entered the bank wearing masks and gloves; (4) Dales and Dunston were armed; (5) Dales stayed near the entrance of the bank and held two bank employees at bay while Dunston and "Dante" took money from the teller counter; (6) the men then left the bank and returned to Dales' house where they divided the money; and (7) the men subsequently burned the clothes they had worn during the robbery. See Doc. No. 118 at 6-12.

At trial, new counsel represented Dales. An extremely experienced criminal defense lawyer, trial counsel was familiar with the form of proffer letter used in this District. Trial

counsel understood that the letter agreement would entitle the Government to introduce Dales' proffer statements at trial if the defense contradicted the statements' substance – whether through testimony or through counsel's statements or questions. See Trial Tr. vol. 3, 3:1–5:2, Oct. 19, 2009. Trial counsel did not suggest that Dales' decision to make a proffer was involuntary, uncounseled, or otherwise deficient.

III.    Trial

The Government did not seek to introduce Dales' proffers until after trial counsel repeatedly contradicted them. See Doc. No. 118. Once again, Dales admitted in his proffers that during the robbery, he brandished a gun and stood near the bank's entrance with two bank employees. From the outset, trial counsel suggested to the jury that Dales was not the assailant standing near the entrance because his physical characteristics differed from those of the actual assailant. Counsel announced this defense in his opening statement, arguing that "[w]hat is an issue here is body size, shoe size is an issue . . . ." Trial Tr. vol. 2, 25:20–21, Oct. 16, 2009.

Dales is over six feet tall and heavyset – taller and heavier than the other assailants. Defense counsel emphasized during cross-examination that four of the five victims had given the police descriptions of the robbers that were inconsistent with Dales' appearance. See id. at 62:1–3 (counsel's statement that bank employee Shantay Marable had described the assailant near the entrance to be "of medium build"); id. at 91:19–21 (counsel's statement that bank customer Scott Walker had described the robbers as "five-ten, thin"); id. at 75:17–19 (counsel's statement that bank employee Bernadette White had described the robbers to be "all about the same height"); id. at 46:20–21 (counsel's statement that bank employee Roseann Hennegan had

4

described the assailant near the entrance to be "in good shape").

The Government also presented the testimony of an expert who had sought to determine whether the DNA of Dales, Joseph Dunston, or Toliver could be recovered from any of the physical evidence seized by police. In cross-examining this expert, defense counsel asked whether three other men who lived in Dales' neighborhood – "Demetrius Dunston, Ray McAllister, or Kev" – had left DNA traces on the physical evidence. See id. at 171:15–23; id. at 172:11–14; id. at 173:5–8. Once again, in posing this leading question – before the prosecution sought to use Dales' proffers – counsel suggested to the jury that contrary to the proffers, these three men (and not Dales, Joseph Dunston, or Toliver) had robbed the bank.

Finally, the bank security video showed that the assailant standing near the bank entrance held his gun in his left hand. Counsel suggested to the jury that this assailant could not have been Dales, who is right-handed. The sole trial witness Dales called was Brandon Stevens, who testified to only one point: that Dales is right-handed. See Trial Tr. vol. 3, 199:18–20, Oct. 19, 2009. Although counsel stated that he decided to call Stevens only after I ruled that Dales' proffers were admissible, the record shows that counsel had always intended to raise this line of defense. See id. at 151:13–19. Before trial, he identified Stevens as the only witness Dales intended to call. See Trial Tr. vol. 4, 2:10–22, Oct. 20, 2009. Moreover, in cross-examining the bank manager – before the proffer issue arose – counsel sought to determine in which hand the assailant near the entrance had held his gun. See Trial Tr. vol. 2, 83:8–9, Oct. 16, 2009 ("Which hand did the robber that pointed the gun at you point with?"). In thus again suggesting to the jury that Dales was not the assailant at the bank entrance, counsel contradicted the statements Dales made to the FBI.

5

Only after defense counsel thus repeatedly contradicted the proffers did the Government seek to introduce the statements themselves, pursuant to United States v. Hardwick, 544 F.3d 565 (3d Cir. 2008). See Doc. No. 118; Trial Tr. vol. 3, 2–11, Oct. 19, 2009. Because I determined that counsel had presented a defense that was "materially different from statements made or information provided during [Dales'] 'off-the-record' proffer," I granted the Government's request. In accordance with Vazquez v. Wilson, I excluded all references made by Dales in his proffers to Toliver, Dunston, or Matthews. 550 F.3d 270 (3d Cir. 2008). See Trial Tr. vol. 3, 182:11–185:3, Oct. 19, 2009.

IV. Discussion

A. Standard

Every Circuit to address the issue has held that the Government may introduce a defendant's proffer once he presents a contradictory defense at trial. The reasoning behind these decisions is compelling:

> By authorizing the prosecutor to use his [proffer] statements if he should contradict himself, [the defendant] made his representations more credible and thus strengthened his hand in negotiations. A prosecutor may be reluctant to negotiate; what has the defendant to offer? A statement that shows how the defendant's aid could assist the prosecutor in other cases (or lead to the appropriate sentence in this one) may get negotiations under way and set the stage for a favorable bargain. But a prosecutor needs assurance that the defendant is being candid. A conditional [Fifth Amendment] waiver of the kind [the defendant] signed tends to keep the defendant honest, which makes the proffer device more useful to the both sides. For this strategy to work the conditional waiver must be enforceable; its effect depends on making deceit *costly*.

United States v. Krilich, 159 F.3d 1020, 1024-25 (7th Cir. 1998) (internal citations omitted) (emphasis in original).

The contradiction of a defendant's proffer can manifest itself through counsel's representations. The Hardwick Court held that because defense counsel's cross-examination "insinuated" a version of events contrary to Hardwick's proffer, the Government was entitled to introduce the proffer statement itself. 544 F.3d at 570-71. This is consistent with uniform Circuit holdings that if trial counsel's representations contradict a defendant's proffer, the Government may rebut those representations with the proffer statement. See United States v. Velez, 354 F.3d 190, 196 (2d Cir. 2004); Rebbe, 314 F.3d at 407; Krilich, 159 F.3d at 1025.

These same Courts have emphasized that a defendant who proffers and then elects to go to trial retains the ability to present a vigorous defense without triggering the proffer's admission. For instance, he or she may ask questions, make arguments, and present evidence to: attack the credibility of witnesses; emphasize the improbabilities and contradictions in the prosecution's case; challenge the expertise, competence, and knowledge of experts; impugn the motives of witnesses; and stress the prosecution's failure to meet its burden of proof beyond a reasonable doubt. See Barrow, 400 F.3d at 118-19; United States v. Dortch, 5 F.3d 1056, 1069 (7th Cir. 1993).

A defendant who proffers and then elects to go to trial will, however, trigger the proffer's admission if he or she calls witnesses, asks questions, or makes arguments that materially contradict the defendant's specific proffer statements. See Artis, 261 Fed. Appx. at 178; Rebbe, 314 F.3d at 407; Barrow, 400 F.3d at 119; Dortch, 5 F.3d at 1068.

B.   Applying *Hardwick* Here

The defense repeatedly contradicted Dales' proffer admission that he was the assailant standing at the bank entrance: (1) counsel stated that Dales did not match the description of the

7

assailant given by four of the five victims; (2) counsel suggested that three other men from Dales' neighborhood had committed the robbery; and (3) counsel suggested that unlike Dales (whom Stevens subsequently confirmed was right-handed), the assailant was left-handed.

When the prosecution sought to introduce the proffers, counsel denied that he had said or done anything at odds with Dales' statements to the FBI. He noted that in his opening he had told the jury "that this is not a who-dun-it." Trial Tr. vol. 3, 5:14–15, Oct. 19, 2009. He contended that his challenged statements were intended only to raise a reasonable doubt. Id. at 5:14–16, 6:24–25 ("I made it clear in my opening statement, your Honor, that this is not a who-dun-it. The issue is whether or not the Government's proving its case beyond a reasonable doubt. . . . There's no suggestion to the jury that my client didn't do it.") The record shows just the opposite.

Counsel belied his own assurance that "this case really isn't a who-dun-it" by suggesting in the same sentence of his opening that "body size" and "shoe size" were "issues." Trial Tr. vol. 2, 25:20–21, Oct. 16, 2009. Counsel's repeated statements respecting the characteristics of the assailant standing at the bank entrance obviously suggested to the jury that the assailant was not Dales – that the assailant must have been someone else. Seeking to avoid the proffers' admission, after experienced counsel initially contradicted the proffers (i.e., "[w]hat is an issue here is body size") he immediately suggested the opposite (i.e., "this case really isn't a who-dun-it"). Similarly, "[a]lthough [counsel] claims he only contested reasonable doubt," he in fact contradicted specific admissions his client had made to the FBI. United States v. Bloate, 534 F.3d 893, 902 (8th Cir. 2008). The Government remained entitled to introduce Dales' proffers even though counsel sought to raise these contradictions in a subtle manner.

8

The Government's evidence against Dales was compelling, including Matthews' convincing description of Dales' role in the robbery. Given the strength of the Government's case, the defense was left with little choice but to try to have its cake and eat it. Obviously intended to benefit Dales, counsel's nuanced efforts nonetheless "insinuated" a version of events contrary to Dales' proffers. <u>Hardwick,</u> 544 F.3d at 570. Accordingly, the Government could properly rebut those insinuations with the proffers themselves.

**BY THE COURT.**

/s/ Paul S. Diamond

_____

**Paul S. Diamond, J.**